No. 34,264

Anna E. Cole and L. A. Cole, d. b. a. Cole's Jersey Cream Dairy, *Appellants,* v. The City of Topeka et al., *Appellees.*

(88 P. 2d 1044)

Opinion filed April 8, 1939.

*Charles Rooney,* of Topeka, for the appellants.

*Ralph Oman,* city attorney, and *William A. Dumars,* assistant city attorney, for appellee city of Topeka.

The opinion of the court was delivered by

Thiele, J.: Plaintiffs brought an action to restrain the city of Topeka and its officers from revoking his permit to sell milk in the city because of his refusal to comply with certain orders made in connection with its ordinance regulating the sale of milk. A demurrer to their evidence was sustained, and they appeal.

Owing to the nature of the question presented, the history of all matters involved will be treated. In 1932 the city enacted its ordinance No. 6210 regulating generally the sale of milk in the city, and which, so far as need here be noticed, provided for permits and licenses for sale of milk; for standards of quality, for inspection of premises where production was had, for testing of products sold to determine quality and sanitary or hygienic condition, etc. We notice specifically sections of the ordinance applicable to the matters in issue.

Section 14 deals with sanitary conditions on farms where milk is produced. As a part of item 8 of that section, it is provided: "No horses, pigs, fowls, etc., shall be permitted in parts of the barn used for dairy purposes." Item 12 of that section provides for a

separate milkhouse or milkroom for handling and storage of equipment, specifying type of construction, ventilation, etc., and "The milkroom shall not open directly into a stable or into any room used for domestic purposes." Other items deal with water supply, construction and care of utensils, and methods of cleaning, handling and storage of them, cleaning the udder of the cow at time of milking; and item 21 provides:

"Each pail or can of milk shall be removed immediately to the milkhouse or straining room. No milk shall be strained in the dairy barn."

Section 15 deals with sanitary requirements for milk plants, the last sentence of item 5 stating:

"Rooms in which milk or cream or cleaned utensils or containers are handled or stored shall not open directly into any stable or living quarters."

Section 16 provides that no milk producer shall transfer milk from one container to another in any place except a bottling or milkroom especially used for that purpose, exceptions provided not being here of moment.

Plaintiffs, who owned about seventy-five cows, conducted a dairy and sold their milk and dairy products in the city. Their property and plant had been duly inspected and requisite licenses and permits had been obtained. In the summer of 1938 tests made by the city showed that the milk contained more than the maximum number of bacteria permitted. In an effort to eradicate the cause of trouble and at plaintiffs' request, the city health officer, the city veterinarian and the city milk inspector made an inspection and, as a result, found seventeen alleged violations or deviations from the requirements of sanitation and operation of the dairy. Most of these were remedied. Plaintiffs, believing some of the requirements unreasonable or beyond the power of the city, failed to fully comply with the requirement that a certain driveway be paved with concrete, that a pouring room be built, that horses be removed from a part of the barn, that only vehicles with an enclosed type body be used to transport milk, and some other minor matters not necessary to note. The city gave plaintiffs a requisite ten-day notice to comply or their permit to sell milk in the city would be revoked. Within that period, plaintiffs filed an action in the district court to enjoin the city from revoking the permit or from molesting plaintiffs in their business. A restraining order was issued. The city answered, and at the trial the city's demurrer to plaintiff's evidence was sustained, the restraining order set aside, and judgment was rendered

for the city for costs. The plaintiffs appeal, the assignments of error being the trial court erred in sustaining the demurrer and in dissolving the restraining order. After appeal to this court was perfected, the proper city officials notified appellants that because of their failure to comply with the orders complained of, their milk would be graded "D," which can be used only for cooking, and in the event they attempted to sell milk in the city, they would be arrested; that result occurred and this court issued its order staying action by the city pending final determination of the appeal.

Reference to matters in the pleadings and evidence will be limited to what is necessary to discuss the assignments. The gist of the petition was that notwithstanding strict compliance with the ordinance by plaintiffs, the city capriciously made undue and unwarranted restrictions and requirements not authorized by the ordinance in demanding that plaintiffs (1) concrete the driveway in the barn, but which was not within the part where the cows are maintained; (2) construct a pouring room in the barn; (3) remove horses from that portion of the barn not used to produce milk; (4) use enclosed type vehicles for transporting milk. It may here be noted that at the trial the city waived requirement mentioned in (1) and there was no controversy about (4); hence, no further reference will be made to them. In another cause of action, plaintiffs claimed the bacteria count taken by the city was inaccurate, but on the trial there was no competent evidence that such was the case, plaintiffs do not complain with respect thereto, and no further reference will be made to this cause of action.

The city's answer contained certain admissions and denials, but for our purposes here was a general denial.

At the hearing in the district court, appellants offered in evidence the ordinance above referred to, a dairy inspection form dated July 21, 1938, which need not be specially noticed at this time, and a letter or notice from the city health officer, addressed to L. A. Cole, dated August 30, 1938, advising that horses must be moved out of the dairy barn, a pouring room must be built, and other conditions remedied, and failing compliance within ten days, the permit to sell milk in the city would be revoked.

L. A. Cole was the only witness called. With reference to horses being kept in the dairy barn, and the pouring of milk in the dairy barn, on direct examination he testified, as abstracted:

"We have three horses and they are in a lean-to built on after the barn was built and there is a partition between them and the barn. They do not mingle nor could they get to where the cows are kept. One hundred fifty feet from the barn is our straining and bottling room. We use a milking machine and use a ten-gallon milk can with a lid on it and empty the milk in those cans and as soon as they are full they are taken to the milkhouse and strained. . . . In fact, I have complied with everything except removing horses from the lean-to, concreting the driveway and building a pouring room. As far as I know, there is not a single dairy in Shawnee county that has a pouring room."

On cross-examination, he testified further, as abstracted:

"I haven't examined other dairies as to pouring rooms, but I have talked to them. I have not been all over the county, but to my knowledge there are no pouring rooms. The pouring room was explained to me to be a place somewhere in the barns to keep your cans in. When the milk is taken from the milking machine it goes into a ten-gallon can with a cap on it. This is done right in the barn where the cow is. We then take the ten-gallon can to the milkhouse, cool it, strain it and bottle it. We go through the barn on our way sometimes. Sometimes we go out the door. We take one can at a time in a two-wheel cart. The cart is not enclosed, but the can has a lid on it. There is no complaint about our straining and bottling room. They wanted me to take the small can from the milking machine and take it into some room to pour it into the ten-gallon can. I do not think it is necessary and insanitary. . . . The horses are on the other side of the partition from where the milk is taken from the machines. . . . On heavy milkers the can is full in ten minutes. It is taken directly to the milkhouse. I refused to remove the horses, refused to build a pouring room and refused to concrete the driveway. All I want is to be treated the same as the rest of them."

After hearing plaintiff's testimony and before ruling on the city's demurrer, the judge of the trial court went to the dairy farm and viewed the premises. When the matter came on for decision, the court made reference to the driveway separating the two sheds or rooms where the milking was done and that the rooms were enclosed, and that to the west of the south room were stalls for horses "but not in the barn." Later it stated: "I think a room where they can pour their milk is proper, and these horse stalls were under the same roof and in the same barn. I think it comes squarely under the provisions of the ordinance, and that will be the ruling," etc.

We have been furnished with a plat which shows the layout of the barn. The whole constitutes a large rectangle with the length to the north. On the north side is an "L"-shaped milking room with stanchions for forty-six cows. It has three doors opening into a driveway which separates it from an "L"-shaped milking room with stanchions for thirty cows located to the south, six of them being

entirely closed off from the other twenty-four. Three doors from the south room open into the driveway. In the recesses on either side of the driveway and to the west side of the barn are open spaces with mangers for horses. They connect openly and directly with the driveway. The horse stalls on the north are shut off completely from the milking room, except by way of the driveway. Those on the south side are shut off except that a feedway to the mangers of the horse stalls and to six of the stanchions is continuous, but has a door separating one part from the other. The ten-gallon can in which milk is poured, referred to in the testimony, is on the east side of the north room. It can be reached only from twenty-four stanchions on the south side by passing across the driveway and into the north room through the various doorways. It is not clear that there is any method of going from the other six stanchions on the south side to this milk can except by going out of a doorway leading to the outside of the barn, and thence to some other entrance to the barn leading to the can.

It is to be noted that in this appeal no question is raised as to the validity or reasonableness of the ordinance. The question only is whether the city's requirements with reference to plaintiffs' plant, in order that they may have a permit to sell milk, are within the terms of the ordinance.

In order that the inhabitants of the city might be assured that in their purchase of milk they would get a pure and unadulterated product that would be wholesome and not unhealthful, the city provided by ordinance that no person could sell milk that had not been produced under conditions specified in the ordinance, and that did not meet the quality provisions set by the ordinance. In such a situation, the only power of the city would be to prohibit the sale— it had no power in and of itself to tell plaintiffs anything about how they must conduct their dairy, but it did have power to say that if plaintiffs did not meet the reasonable requirements of an ordinance regulating production and sale, that sale could not be made without incurring liability.

The purpose of such an ordinance is too plainly the protection of the public health to require comment. That different persons might have different notions of what means are necessary to be used in order that certain sanitary standards may be attained, and certain quality fixed and assured, cannot be doubted. And that the governing body of the city, acting in its legislative capacity, has power to

enact an ordinance making reasonable requirements may not be gainsaid. As has been noted, the reasonableness of the ordinance had not been questioned.

We take up first the contention the demand of the city that plaintiffs construct a pouring room was beyond the requirements of the ordinance. Two specific provisions of the ordinance recognize that milk may become contaminated by exposure to air which may contain dust and germs, namely, section 14, item 21, and section 16, referred to heretofore. The plaintiffs' testimony disclosed that their method of handling milk required pouring from small containers to the large ten-gallon can which was then taken to the place where it was cooled and bottled. This plainly disclosed that milk was transferred from one container to another at a place other than in a room especially used for that purpose, in violation of section 14 above noted, and also that each pail or can of milk was not removed immediately to the milkhouse or straining room as required by item 21 of section 15 quoted above. It is to be noted that section also prohibited straining in the dairy barn. It is somewhat difficult to see where, under the circumstances, there is much difference between pouring from one container to another and straining. We think the trial court rightly concluded that plaintiffs must construct the pouring room if they are to continue selling milk under their permit from the city.

The remaining question deals with the ruling that horses must be removed from the barn. The portions of the ordinance pertaining to the keeping of livestock, other than dairy cattle, in parts of the barn used for dairy purposes (sec. 14, item 8) and that milkroom or rooms in which milk, cream, cleaned utensils or containers are handled, shall not open directly into a stable (sec. 14, item 12, and sec. 15, item 5) have been noted above. We have also detailed the testimony of plaintiff and the remarks of the trial judge after inspection of the premises, and have stated the relation of the various parts of the barn where the horses are kept to the parts where the milking is done as shown by the plat furnished. A majority of the court conclude that it may not be said that horses are kept in any part of the barn used for dairy purposes, nor that any milkroom or rooms in which milk or cream, or cleaned utensils or containers, are handled, open directly into any stable, and that therefore the requirement that the horses be removed from the barn was beyond the terms of the ordinance. The city makes a contention that its

officers are vested with some discretion in the enforcement of the ordinance, and that the orders made should not be enjoined unless it be found they acted in bad faith. That general rule may be admitted. Here, however, we have an ordinance going into considerable detail and making specific provision with reference to horses and stables and stating when they shall not be allowed. The only inference deducible is that under circumstances not denounced, horses may be kept any place the owner desires. To hold otherwise would be, not to permit exercise of discretion by the enforcing officer, but to permit him to legislate other, further and different requirements than the city made by its own ordinance.

We conclude the trial court erred in holding that plaintiffs must remove the horses from the barn as a condition to their right to a permit to sell milk.

In view of what has been said, the judgment of the trial court is modified by eliminating the requirement that plaintiffs remove the horses from the barn, and as so modified, the judgment is affirmed.

THIELE, J. (dissenting in part) : I concur in all that is said except with reference to removal of horses from the dairy barn. I think it is well understood that one of the sources of contamination of milk with resulting high bacteria count is the handling of milk in places where it may be exposed to dust and dirt. And that the feeding of horses, their habits in stamping in their stalls, switching their tails, etc., produces and keeps dust, dirt and germs in the air needs no elucidation. It may not be said that because the horses do not go into the stalls or use the stanchions of the dairy cattle, the question is settled. There is a direct connection from the horse stalls to a part of the dairy barn by means of the feedway, and the fact there is a door there does not alter the situation, for the only way to use six of the stanchions is to open the door or to carry feed entirely outside the barn so as to enter through an outside door—a thing very unlikely to happen. In addition, the horse stalls are entirely open to the enclosed driveway and it is not over ten or eleven feet from the horse manger to the nearest doors opening into the milking rooms on either side of the driveway. The judge of the trial court, after hearing the evidence and viewing the premises, concluded, in effect, that the requirement was within the terms of the ordinance. I think the record fairly discloses that to be the case.

WEDELL and ALLEN, JJ., join in the foregoing dissenting opinion.

Dawson, C. J. (dissenting in part): When a dairyman comes into court with a well-founded grievance against an official board, in which he asks that it be restrained from enforcing its order in three particulars alleged to be oppressive and unreasonable—to cement the driveway of his dairy barn, to remove his horses from the barn entirely, and to construct a pouring room—and the defendant confesses that its order requiring the driveway to be cemented is unreasonable, and this court says its order requiring the removal of the horses is unreasonable; and we only permit the very debatable part of its order requiring the construction of a pouring room to stand, it seems lamentably unjust to conclude the opinion of this court with the usual stereotyped words of modification and affirmance. Certainly plaintiff has won at least half a victory in this court, and has won two-thirds of all he complained about and for which he sought redress when his action was begun.